**08 C 977**

**JUDGE NORGLE**
**MAGISTRATE JUDGE NOLAN**



THE RESOLUTION EXPERTS®

|  |  |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| COLBORNE CORPORATION, | ) CASE NO. 1340005020 |
| | ) |
| Claimant, | ) |
| | ) HON. RICHARD E. NEVILLE (Ret.) |
| and | ) |
| | ) |
| BOULDER PARTNERSHIP, LLC. | ) |
| | ) FINAL AWARD |
| Respondent. | ) |
| | ) |

TO:    Mr. Stuart D. Gordon, Esq.          Mr. Glenn A. Fischer, Esq.
Mr. John C. Eggert, Esq.               Mr. Panos T. Topalis
Gordon & Karr, LLP                  Tribler Orpett & Meyer, P.C.
150 N. Wacker Dr.                  225 W. Washington St
Ste. 1650                        Suite 300
Chicago, IL 60606                 Chicago, IL 60606

*Attorneys for Colborne Corporation*       *Attorneys for Boulder Partnership, LLC*

## INTRODUCTION

The principals of each company met late in 2000 and worked together in 2001 per a letter agreement to improve their companies both as to customer base and as to product line. Boulder Partnership, LLC (BP) was a new start-up comprised of Kenneth Major and Michael Weinstein, who were sales representatives at another company with experience in robotic flexible loading systems. They had a design system that they bought from their previous employer when it decided to leave the food industry and remain in its original market—the medical device industry. BP did not have any employees nor did it have a facility of its own to build or assemble a flexible loading system.

Colborne Corporation (CC) is a 100-year-old company that basically had produced systems for the bakery industry to process pies, breads, muffins, etc. It did not have a robotic flexible loading system, although it had previously designed and sold many gantry type loading systems. It had not used a commercially available robot to add to their business product line.

**EXHIBIT**

**B**

The parties agreed that they would work together to expand the systems that CC could use for its customers and that BP would market these new designs and comprise part of the CC sales force and that BP would be paid commissions for any sales that they made on behalf of CC. Colborne Corporation had 50 to 60 employees and its own plant facility to make and assemble loading systems for the bakery industry.

The parties signed a Letter of Understanding on Feb. 8, 2001. This did list some customers that had already received quotes from Colborne in which Boulder Partnership was entitled to commissions should the customers enter into a contract. The parties thereafter entered into a Relationship Agreement which detailed the business relationship between them going forward. Up to the signing of this document, there had been no sales for which the parties were in dispute as to the commissions due or sufficiency of the work performed by BP or Colborne.

Subsequently, the parties did design and sell certain robotic flexible loading systems. The design engineering was performed by Michael Weinstein, the sales by Kenneth Major and Michael Weinstein or by Colborne owners Rick Hoskins III or Rick Hoskins IV.

A dispute arose as to the "Weston" project, including the responsibility of Mr. Weinstein to participate in the repair and remediation of design flaws or assembly flaws in the project installation. Each party herein blames the other for the cost overrun in the Weston project.

BP also was dissatisfied with the commission structure of the Relationship Agreement and requested a change in their payments. Colborne indicated it would be willing to talk about the issue, but only after the Weston project was completed to Weston's satisfaction.

On August 29, 2003, BP wrote a letter to CC to confirm "our intention to terminate our relationship with Colborne". No specific termination date was stated, and there was an acknowledgment that some issues needed to be resolved, including the interpretation of the termination clause in the existing Relationship Agreement.

The parties had bid several other jobs which had not been accepted by the customer at the time this letter was sent. Eventually BP bid these same jobs on its own and that was the catalyst for this Arbitration.

The parties per the Relationship Agreement selected a sole arbitrator; and then agreed to use the JAMS Commercial Arbitration Rules. Colborne filed its Complaint on August 26, 2004, and Boulder Partnership filed its Answer and Counterclaim on December 3, 2004. There was significant motion practice that originally revolved around the issue of confidentiality and proprietary business information. Eventually, discovery was provided by the parties to each other, and Boulder Partnership filed a Motion to

Dismiss, which was denied without prejudice to re-file at the Arbitration Hearing. The Motion to Dismiss was re-filed and heard along with the evidence in this matter.

Colborne Corporation has made claims against BP for Trade Secret violations, Breach of Contract, Breach of the Relationship Document, Deceptive Practices, and Interference with Economic Advantage.

Boulder Partnership had denied liability for all Colborne Claims against it and has Counter-Claimed for Trade Secret Act violations by Colborne, commissions due per the parties' Agreement, and the remaining balance of the Weston Engineering Contract

Evidence was presented on May 30 and 31 and June 1, 2007, and also on August 14 and 15, 2007. Prior to the hearing, each party provided the Arbitrator with a pre-hearing brief and the bulk of the exhibits that would be introduced at the hearing The parties filed 175 exhibits. The proposals for BBL Systems include design drawings.

The parties each filed a post-hearing brief on October 15, 2007, and Reply Briefs on November 12, 2007. The parties also agreed that the date for completion of the Award by the Arbitrator would be extended to December 20, 2007

## DISCUSSION

The following is a statement of those facts found by the Arbitrator to be true and necessary to the Award  To the extent that this recitation differs from any party's position, that is the result of determinations as to credibility, determinations of relevance, burden of proof considerations, and the weighing of the evidence, both oral and written

When the parties first agreed to working together, CC agreed to pay BP $40,000 as commissions on sales. No sales for robotic flexible loading systems occurred during this first period under the letter of understanding. That system was designed to work in the food industry and eventually became a Bread Basket Loading (BBL) system. The parties eventually signed a document titled "Relationship Document".

The Relationship Document is dated October 3, 2001 and signed by Mr. Hoskins and Mr. Weinstein on behalf of their companies on October 16 and 17, 2001. This document stated that BP was to receive $2000 a month plus approved expenses. These funds per month of $2000 and the approved expenses were to be applied as advances on future commissions but not refundable to CC if no commissions were earned by BP.

This Relationship Document describes the product to be sold by the parties under their agreement as Colborne Flexible Automation Solutions and that BP is an exclusive agent to CC for such sales. The document also provides that CC is able to sell without BP sales or technical support, any Flexible Automation Solutions where Colborne already

has the technology. Thus, BP was not an exclusive agent for those sales. All proposals were to be in Colborne's name and were to be considered "Colborne Projects."

On November 26, 2002, the parties began discussing a change in the relationship between them. BP was interested in expanding its role and dealing directly with customers as Boulder Partnership and to sell Bread Basket Loading Systems under its own name. BP Ex. 9 contains the Rick Hoskins IV response to the ongoing discussions and also the response of Ken Major including an amendment to the Relationship Document and a two-page document titled BP Sales Lead Review. BP lists 40 potential customers and 6 other projects and estimates the volume of business from all these sources as 50 Million Dollars. No new contract was signed by the parties as a result of these discussions.

On February 27, 2003, Rick Hoskins IV sent a red-lined Relationship Document which contained several changes including a non-compete clause. This document was never signed by the parties.

The original Relationship Document did not contain a non-competition clause or a confidentiality agreement.

The parties never did agree on any alteration of the original relationship document nor did they ever settle on a different arrangement for the marketing, sales, contracting with customers, ownership of any new jobs ie. Colborne projects or Boulder projects, or a different commission structure. The negotiations continued through the Weston project until there was a termination of the relationship.

BP was to earn 10% commission. All baking and related industry projects were to be considered Colborne Projects. Both parties excluded certain companies and past relationships as protectable and listed them in the Relationship document. BP had certain systems in the field with Freeds, King Soopers (Colorado), Safeway and Dunbar, and it was free to continue servicing those accounts or replicating those systems. However, any future sales to those same companies were to be considered "Colborne Projects". Also, BP was to be considered to be acting as a direct employee of CC when talking to prospects in the baking and related industries.

CC had existing relationships as well and listed 15 companies that BP could not contact, without Rick Hoskins' approval, in representing Colborne for Flexible Automation.

The agreement was to cover all Colborne or BP projects. If either side terminated the contract then BP was still to receive its commissions on any project covered by this agreement if the project was awarded within 6 months after written termination.

The agreement requires BP to repay any unearned advances on commission if BP breaches the agreement.

5

The CC and BP Relationship Agreement obligated the parties to use and abide by the decisions of an independent arbitrator to resolve any disputes

The parties did state in their agreement that they would attempt to utilize standard terms of agreements as published within MANA (the Manufacturers Agents National Association) for any issues not covered under this agreement. Although this statement is in the Relationship Document and both parties cite to it in their briefs for certain interpretations of the parties' relationship and rights and obligations, neither party presented any evidence that the other had agreed to use MANA in this dispute, nor did they tender to each other their interpretations prior to the hearing for any motion practice on this issue  The Arbitrator finds that the written agreement between the parties offers MANA as a dispute resolutions technique to attempt to resolve issues that might arise between the parties, but they never did attempt to do so. Their citations to this Association Manual were never attempted to be utilized by the parties for the issues that arose between them  Therefore the provisions of MANA are not controlling in the Arbitrator's decision.

The parties have identified several projects and the misuse or conversion of certain proprietary information i.e. costing, pricing and profit information as the basis for their dispute  BP has in addition claimed that CC has used its intellectual property in the form of Bread Basket Loading Systems that was originally produced at Technistar Industries. CMED had purchased the design for $10,000 from the bankruptcy proceedings of Technistar and then Weinstein and Major purchased the same design package from CMED when it decided to leave the food industry and concentrate its core business i.e. medical devices. Michael Weinstein and Kenneth Major, who were employed by CMED as sales personnel purchased the BBL design package from CMED for $500 and then began Boulder Partnership together.

Boulder has stated in its briefs that the alpha and omega of this case is that Boulder had a proprietary interest in a Bread Basket Loading (BBL) system and that Colborne improperly tried to make said BBL its own system.

Boulder posits that after all the testimony was presented there is only one conclusion that can be drawn. That conclusion is that neither party to this agreement had a comprehensive understanding of the document.

## AS TO THE WESTON PROJECT

The Weston project was the first sale by the parties under their Relationship Document and became the catalyst for the termination of the relationship between the parties. Although it was an important customer and did result in a contract for 4 separate robotic installations, the delays in installation and the customer complaints about the design and/or installation issues caused a decrease in the expected profits

Each of the parties has blamed the other for the problems in the Weston project. While Mr. Weinstein admits he was slightly late in preparing the design drawings, he also

6

blames Colborne for delays in the assembly of the BBL and also the failure to run tests in their plant before sending the system to Weston. Colborne blames BP for being substantially late with the drawings and for failure to work with them to correct the design deficiencies of Mr. Weinstein's drawings and that they had to have Mr. Tatrow engineer the modifications that ultimately fixed the problems.

BP produced a former Colborne employee who testified that Colborne was mostly understaffed and always had problems staying with their timelines because of too few employees and poor supervision.

Colborne was forced to expend monies to fix the BBL line and Weston expended additional monies for its employees to work on fixing the problems. Weston prepared a list of problems on September 8, 2003 which included many issues. Some were design issues (Col Ex 40).

Mr. Weinstein was responsible for the design of the Weston project, and BP had agreed that it would pay $50,000 for the design. Exhibits produced by both parties show that BP's obligation was to provide a "complete system design and software". CC was obligated to pay an additional $50,000 if the same design and system was used again with a different customer or with a separate project.

It is clear to the Arbitrator that the parties never intended to spend the time and effort at the Frederick facility of Weston that was required by the customer as a result of system failures. It is also clear that both parties had a responsibility to complete the system in an acceptable manner. The issue of whether some changes were a result of poor design has been documented by both Weston and the CC fall of 2003 monthly reports and testimony from Mr. Tatrow. However, the issue of whether all the additional expense was the result of only a faulty design has not been proven by CC.

BP claims that Colborne cannot prove design defects by the testimony of Mr. Tatrow, as he is not qualified to opine on that issue. The reason the system did not work has been explained by the correspondence between BP, Weston, and Colborne from the Spring of 2003 through the late fall of 2003. The Arbitrator accepts that the design was faulty in many respects, as it did not work as it was meant to when assembled in the field.

Colborne Exhibit 59 clearly shows that the issues with the Weston project resulted in significant changes to the design of Mr. Weinstein in order to make the design functional.

Mr. Tatrow is qualified to testify, and BP's statement that he cannot testify as to Mr. Weinstein's engineering of this system because he does not have an engineering degree misses the point. He has worked with like systems for 40 years. The customer, Weston, made it clear to everyone what problems existed. The fix for these took time and expense but eventually the BBL worked. Obviously, Mr. Tatrow was able to fix the problem when BP refused to assist in the completion for the design issues.

Colborne claims that it spent an additional $192,000 to rectify the problems that were caused by Mr. Weinstein's design deficiencies. BP claims that all the problems were caused by Colborne's poor assembly and lack of testing before the product was brought to Weston's facility.

Mr. Weinstein testified that he did go to the Frederick plant to try and fix the design and installation problems and that he did this because he is a "good guy" not because he had any contractual obligation to do so. He further testified that he stopped going to the Weston plant because he had other obligations to BP and wasn't getting paid to work at the Weston plant. He said he was paid to do the design work and that he did. He further stated he did not give a performance guarantee

Colborne used its long time employee, Bernie Tatrow, to stay at Weston and work on the project until it was successfully installed. Weston dropped its payment by $52,021 as a result of the late working installation of the BBL and its own resources that it had to employ to assist with the implementation of the BBL.

There has been no evidence presented by Colborne of any contractual penalty that it could charge BP for being late or for not working at the Weston plant. But any design engineer's scope of work in this situation would require that Mr. Weinstein, as the design engineer, make sure that after the drawings were finished that the assembly and test runs showed a completed, working system and to cooperate and help in the redesign of non-working parts of the system.

It certainly would be expected in any such a business relationship and projected ongoing sales, design, assembly and installation of BBL's that the parties would work together to make customers happy and satisfied to assist in their future sales.

It is common in the industry for the design engineer to stay connected to the project to work through common glitches in such a mechanical process. Whether Mr. Weinstein was obligated to stay at Weston on the premises was not contractually spelled out between the parties.

Since it is not contested that Mr. Weinstein received his $50,000 agreed payment and that he was present both at Colborne and Weston premises to assist in working out the problems, even though he didn't return as often as Colborne would have liked, there is no sustainable contract breach which would require a return of all the $50,000 payment or a back charge to BP for the $196,000 claimed in time and materials to retrofit the original design. The evidence as to the contract obligation of BP and the work actually done by Colborne is lacking.

However, it is also uncontested that BP received its commission up front and that Weston did not pay the contract price but reduced their payment by $52,021 and therefore BP is responsible for the return of $5202 as commission not earned

## AS TO THE BP CLAIM THAT COLBORNE OWES AN ADDITIONAL $50,000 FOR USING THE WESTON ENGINEERING IN ANOTHER PROJECT

There is not sufficient evidence presented by BP that the Weston BBL engineering was ever used again by Colborne. The inferences that BP wishes the Arbitrator to make that Colborne must have used the same engineering at Pepperidge Farms and elsewhere is not sufficient to reach their burden of proof on this issue.

Although BP tried to negotiate a $100,000 payment for Weinstein's drawings for the Weston project, the parties negotiated an agreement of $50,000 for Weston and $50,000 for any other project using the same design.

Colborne states they couldn't use the same design again because it didn't work at Weston and had to be completely re-engineered by them for Weston to accept and pay for the BBL. Since neither Mr. Weinstein or Mr. Major were at the Weston plant to see the finished project and BP presented no evidence that the design was ever used again, BP has not sustained its burden of proof on this issue.

The additional argument that BP makes that they are entitled to another $50,000 for the additional lines that were installed at Weston using Mr. Weinstein's design is not supported by the written agreements of the parties. There is no document produced which can be interpreted to have an additional payment for the same design work at the same company.

## AS TO THE KROEGER PROJECT

BP submitted proposals to Kroeger both on behalf of CC under the Relationship Document and then on its own behalf. It appears that BP started to engage Kroeger in December of 2002 for its own benefit, and never told CC.

Ultimately, Kroeger awarded the contract for its BBL needs to AMF which had also been under consideration along with CC and BP. There is evidence that Kroeger had been seriously considering AMF all along and that both CC and BP had an uphill battle to be selected. No one from Kroeger testified to explain whether they would have awarded the contract to CC because it had a better or cheaper proposal. It is just as likely that AMF had the inside track for this project.

There is no doubt that eventually Kroeger did not select either CC or BP because they were also aware of the conflict in existence with BP submitting a proposal as an agent for CC and also submitting a proposal on their own behalf. Kroeger did not want to be involved in a potential lawsuit.

There is insufficient evidence presented by CC to sustain its burden of proof on the damages model they present which requires significant evidence that they would have been successful in landing this project were it not for BP's interference. They have not met their burden of proof as to liability on this issue.

9

It is however, additional proof of BP's business practices and their direct competition with CC on a "Colborne project" and with a Colborne customer.

## AS TO THE PEPPERIDGE FARM PROJECTS (PF)

It is undisputed that the initial contracts with PF were begun as Colborne projects, and the fact that the ultimate sale went to CC is not a complete defense to the activities of BP and the communications sent by Mr. Major.

A proposal was sent to PF on June 23, 2003. It was an updated BBL with an updated costing proposal. This was sent by Ken Major on behalf of Colborne

On October 3, 2003, another updated costing for a BBL system was sent and again the letter accompanying the proposal was sent on Colborne stationery and signed by Ken Major. Apparently even with the termination letter having been sent in August, the parties were both interested in making a sale to PF for a Colborne project.

Mr. Major then proceeded along with Mr. Weinstein to attempt to procure the same project for BP with what appears to be the exact same concept that they put together for Colborne but with a new type of robot when it became available in " Q2 or Q3 of 2004". The BP proposal was at a lower quoted price than the CC proposal. Obviously, Mr. Weinstein and Mr. Major knew the quote that CC had made since Mr. Major sent it out over his own signature.

Since the Relationship Document does not contain a NON-COMPETITON restriction, BP was free to compete in any legal way for the PF business assuming that the Relationship Document had been terminated. The letter of August from Mr. Major says that we intend to terminate. The parties had been unable to renegotiate their deal even though BP had expressed its dislike of the arrangement and it had been on the table for more than 9 months that BP wanted a change.

A series of letters in September between BP-Ken Major and CC-Rick Hoskins IV do shed some light on the contemporary thinking of the parties.

A. Rick Hoskins writes to Ken Major and Mike Weinstein on Sept 3 and tells them that there are still many design related issues with the Weston system, and that Mike had agreed there were some, and Mike agreed that he needed to work through them. Rick says CC would not discuss the termination until Weston was complete. He also reiterates that they paid for the engineering, and in everyone's opinion, the engineering is not complete until the customer cannot point to design flaws as the reasons for inefficient operation.

B. Ken Major writes on Sept 8, 2003, to Rick Hoskins and states "attached is a follow up letter to the BP-Colborne relationships. Per our conversations, we will move ahead with Colborne on selected opportunities, while maintaining our freedom to pursue other opportunities." There is an attached letter that basically says, we will continue to support CC on the PF-BBL system and support the completion of the Frederick project. However, Mr. Major also asks for the additional $50,000 for Weinstein's engineering on Frederick and for commissions on PF if the project is sold to them. It also reiterates that the termination clause does not prevent BP from receiving its commissions within 6 months of termination.

C. Rick Hoskins responds on Sept 8, 2003, that BP does not have the right to terminate this agreement at its discretion and that he does not agree to the letter proposal sent by Major.

D. Ken Major sends another proposal on behalf of Colborne to PF on October 3, but by Oct. 23 he refuses to send another.

It is clear to the Arbitrator that both parties believed that BP intended to terminate the contract between CC and BP on August 29, 2003. It is also clear that the parties attempted to stay together on some projects, hence the PF proposals sent by Mr. Major as Colborne proposals.

It is also clear that Mr. Major and Mr. Weinstein agreed to support the completion of the Weston project and did not complain that there were still issues of design defect that needed to be addressed per the September 3 letter from Mr. Hoskins.

Mr. Weinstein never returned to the Frederick (Weston) facility to complete the engineering work. His statements that he only was paid to provide the drawings and did not guarantee performance are neither logical nor correct under the agreements in this case.

Mr. Major sent a letter to PF when he was attempting to secure the BBL project for his own company which comments on BP, CC, and AMF. Colborne has stated that the comments of Mr. Major are incorrect, not opinions and are disparaging and the reason that Colborne had to lower its prices in order to secure the PF business. CC has therefore asked for damages in the amount of the difference between their original quoted price and the contract price that secured the project from Pepperidge Farm.

PR ultimately awarded their project contract to CC. The issue of the lower price that CC had to ultimately agree to was surely influenced by the competing proposals of BP. However, the fact that CC received the contract also shows that the letter CC claims was a serious disparagement was not taken seriously by PF. In addition, there is absolutely no evidence or reasonable inferences that the Arbitrator could find in the record which would justify damages for the letter's influence on the ultimate project price.

## AS TO THE FEBRUARY 9, 2004 LETTER

Colborne complains that the letter disparaged them and caused them to lower their prices to obtain the PF project.

The comments in the letter do not generally rise to the level required to prove a Deceptive Practice Claim. The parties never did agree on a definition of a robotic system and the definition introduced by BP stating that a robot requires a 3 axis mechanical movement was never contradicted by CC, nor did CC produce any evidence that they had previously used 3 axis machines. In any event, all parties agreed that CC had never designed or built a BBL with a commercially available robot before they received the technology from BP.

The other comments on the size of their business and the scope of their previous work are not actionable in themselves. The comments on the length of time that the Hoskins owned the business is of little moment when there is acknowledgment that Colborne has been around for 100 years.

There is insufficient proof to reach the burden required of Colborne for a Deceptive Practice Claim.

## AS TO THE NORTHEAST FOODS PROJECTS (NEF)

Colborne claims that both Major and Weinstein admitted that all of the information collected in connection with Colborne's proposal for the robotic tray loading of English muffins was gathered by them on behalf of Colborne. Then it cites to its Exhibit 4, which was a proposal to NEF on December 30, 2002, on behalf of Colborne.

There was not evidence presented which proved any communication thereafter by NEF and CC to negotiate a deal, nor any evidence that NEF was interested in the proposal.

CC then posits that BP made a proposal to NEF and received the project and that therefore CC is entitled to all the profits they would have made if their price had been accepted instead.

However, the BP proposal was made on May 20, 2004, approximately 17 months after the CC proposal and 9 months after the termination of the Relationship Document. Again, there was no non-competition clause in the Relationship Document, no proof that the proposals were identical, and even if they were, no proof that the parties had agreed that the issue of a Colborne project was intended to bar forever any BP proposal to someone in the baking industry who had received a proposal during their relationship.

12

The evidence that Mr. Weinstein and Mr. Major had other contacts with NEF including through another NEF vendor (Goldco), and the fact that no negotiations between CC and NEF were ongoing are sufficient to bar this claim. A prohibition against BP forever, from contacting NEF without some specific consideration would be unenforceable in any event. The parties were in competition with each other as they were unable to reformulate their agreement.

The evidence adduced was insufficient as to the reasons CC did not win the project from NEF over a year before or as to how its costs and prices were set in relation to the costs and prices in the BP proposal.

## AS TO MIKAWAYA

The proof of the Mikawaya claim and its damage model is totally lacking.

There was no evidence produced that the settlement reached between CC and Mikawaya in any way was connected to BP's responsibilities on this project.

Since CC brought suit for the remainder of the contract, it must have asserted that it performed its contractual obligations and that Mikawaya was in breach of the contract, which by inference confirms that BP was entitled to its commission.

Whatever occurred for CC to drop its case and pay $25,000 to Mikawaya was not explained and in any event was a litigation decision in which BP did not participate.

The Arbitrator has been asked to take back the commission from BP based on its conduct with other CC customers and claims that BP forfeited its right to the second installment of its Mikawaya commission. The Arbitrator finds that there is neither justification for this demand nor legal basis for its enforcement.

The demand that BP pay back its commission because of the outcome of the litigation is not justified by the agreements between the parties or by the evidence produced at the hearing.

## AS TO BOULDER PARTNERSHIP'S COUNTER CLAIM FOR DAMAGES BASED ON A VIOLATION OF THE TRADE SECRETS ACT

Boulder Partnership alleges that Colborne is in possession of "BP intellectual property, know how and engineering designs for a flexible 'bread basket loading system'".

The Counter Claim alleges that Colborne is attempting to sell that intellectual property to companies such as Kroeger and Pepperidge Farm.

The intellectual property is the engineering plans which Mr. Weinstein had prepared for the BBL system that was installed at Weston.

BP did not present any evidence that in fact Mr. Weinstein's BBL system was used at any of the business projects in this case ie Kroeger, Pepperidge Farms, or any other CC customers.

During examination at the hearing, neither Mr. Major nor Mr. Weinstein were able to state that they knew that their IP had been used elsewhere. In fact, CC representatives, including Mr. Hoskins III and IV and Mr. Tatrow had all testified that the system was so faulty that they couldn't use it again and that they never had used it again anywhere.

In addition, Mr. Major decided to put a $500,000 value on this IP, without any analysis or expert testimony or in fact any explanation as to how that figure was decided upon. In fact, the BBL system was purchased for $500 from CMED who had paid $10,000 for it a few years before.

In addition, the IP has apparently been sold to Stewart Industries, so that BP may not be the proper party to complain about this issue, at this time.

There has been no evidence introduced of any misappropriation of a trade secret by CC and the damages model was not persuasive to the Arbitrator.

## ANALYSIS

There was no contract provision that provided for a term of months or years in the Relationship Document. Rick Hoskins, IV wrote to Ken Major that BP did not have the right to terminate this contract at BP's discretion. He did not cite a reason for his belief. During the hearing in this matter there was no evidence introduced that would have provided for a term of years or any modification of this agreement which would have prevented BP or CC for that matter, from terminating the Relationship Document at any time with or without a reason for doing so.

Therefore, the Arbitrator finds that the weight of the evidence is that the August 29, 2003 letter from BP to CC and the following communications between the parties proved that there was a termination of the Relationship Document and its rights and obligations of the parties as of the date of that letter.

Obviously, both parties continued to work on some projects that were in the works but, not under the agreement of October 3, 2001. Any obligations or rights which were in existence prior to the termination were of course enforceable by the parties.

The claim by CC is that its costs, pricing, margins, and customer requirements were confidential information. It posits that its proposals were Confidential and Proprietary, and that supports their position. BP claims that they had their own contacts

14

in the bakery industry and that the Relationship Document did not contain a confidentiality provision.

The Arbitrator agrees with CC that costs, pricing, and margins are commonly accepted as highly sensitive information and confidential, especially as CC had its own password protected computer system to prevent the dissemination of such information.

There is not an absolute requirement for there to be a confidentiality provision, although it would be better practice to have one, if the parties make it clear that they intend to treat this type of information as confidential. By agreeing that all the projects in the bakery industry were to be "Colborne Projects" the parties were clear that the sensitive information was not to be used by BP after termination to compete with the same customers. Otherwise, there would have been no need for that terminology.

BP argues that there was no impediment in the Relationship Agreement for BP to compete with CC after the termination of their agreement. They are correct. However, the obligations of the Relationship Document that all projects in bakery goods are to be considered CC projects makes the conduct of Mr. Major and BP subject to scrutiny when BP and Mr. Major are competing at the same time they are representing CC, with the same proposals to the same customer.

As to Kroeger, the foregoing comments and discussion of the evidence make it evident to the Arbitrator that CC has not been able to prove by a preponderance of the evidence that any actions by BP were responsible for the project to be awarded to AMF. In fact it is clear that AMF was the front runner for the project in question as the internal CC communications indicate.

The obligation of BP to continue working on the design problems with the Weston project has been established by the weight of all the evidence, including the agreement of BP to continue to help solve the problems even after termination, the communications by Weston that clearly detailed design issues, the unremarkable testimony of Mr. Weinstein that he only worked on the non functioning system because he is a "good guy" and that he had earned his $50,000 just by completing the drawings, without regard to their functionality.

However, the attempt by CC to recover $196,000 in labor and material costs as a result of a $50,000 payment for engineering is not reasonable or credible. First, there are Mr. Weinstein's complaints that the building of the Weston system at the Frederick location without first assembling the remaining lines at CC's plant and testing is a logical issue as to the expense in traveling to Weston and housing the employees and Second, that the testimony of CC's former employee that CC is consistently understaffed and not well supervised was corroborated by the lack of a formal remediation plan by CC which required Weinstein to come intermittently, and this interfered with his other obligations to BP. The inability to coordinate the repair lies more at the feet of CC than elsewhere The proof of the materials or labor of this additional expense was not complete and did not adequately show $196,000 solely required because of design defects. Certainly the

15

same Weston document which showed design flaws also showed assembly and materials issues which were not Mr. Weinstein's obligations or responsibilities. The evidentiary burden for that proof was CC's

In addition, the BP arguments that the design defects should have been reviewed and found at that time, has some traction as an argument but is not a defense to Mr. Weinstein's obligations. CC said it would have its team review the system. Obviously, it Weinstein didn't see a problem, people less familiar with the system wouldn't have been as likely to find them either until the assembly and test runs.

But, Mr. Weinstein did not complete his obligation to CC for the engineering fee he and Mr. Major agreed upon; he did not return as often as requested and never did show up again after BP acknowledged that there were design issues and had committed to assist with the project until completion. Therefore BP must return a portion of the paid engineering fee as it was not completely earned. BP is also responsible for the lack of cooperation by Mr. Weinstein to complete the repair of the system.

It is undisputed that the agreed purchase price was not paid by Weston and that it was reduced by Weston's additional system building work. They did not pay $52,021 of the purchase price and the commission paid on the total contract price was therefore an overpayment of $5202.00

The actions by BP as they relate to Pepperidge Farm certainly fall within the intended obligations of the Relationship Document. Regardless of the lack of a confidentiality provision, both the common law and the Document requirement that the quoted projects were all "Colborne projects" makes it absolutely clear that BP was not ever intended or permitted to use the pricing, costs, and margin confidential information for its own purposes in competing with Colborne.

During the hearing BP never dealt with this issue beyond contending that the termination on August 29, 2003 ended their inability to compete with CC as their was not a non-competition clause. On the face of it, they are correct and should they have decided to make a proposal to Pepperidge Farm for a different project, they would have been within their rights to do so.

But, the clear intent of the Relationship Document was that they could not take these projects as their own, especially as herein , where they were contemporaneously preparing the proposal for the same project on behalf of CC and themselves.

Mr. Major's interpretation of the Relationship Document is entirely self serving and not persuasive. In addition, his course of conduct in the fall of 2003 makes it clear he was not constrained by any legal obligations. His stated belief that he was mistreated by CC was completely non persuasive. His conduct during the PF negotiations was unprincipled and a violation of his contractual obligations.

BP also knowingly used a different robot for its contemporaneous proposal to PF and this clearly violated their contractual obligations to CC when they told PF that their proposal was much better but never told CC what they were doing.

## AS TO THE DAMAGE MODEL OF CC

Since no one from Pepperidge Farm ever testified and since there is No document that clearly states that PF wants a different price because of the BP proposal, the determination of damages requires an analysis of several items.

The letter from Mr. Hoskins to PF alluding to his agreement to reduce his price by 15% because of certain outside influences may mean BP but he didn't expressly so indicate. And this reduction corresponds to the BP Commission that they would be due if the project was accepted by PF. Thus no damages for this first reduction are awarded, as he didn't pay BP any commission.

The subsequent reductions were not explained during the hearing as to any negotiations with PF nor was there ever any proof that PF was originally going to pay the proposal price, especially since there was more than one system to be designed and built and in all the other materials that were produced in this case, a reduction in price is common as a discount for bigger projects with more systems.

As PF did contract with CC but at the same time had competing proposals from BP at lower prices, the weight of the evidence is sufficient to establish that part of the reduction in price by CC was the result of the inappropriate competition for the same project by BP.

The request for its commissions on the PF sale while it was directly competing with CC with confidential information is creative but faulty. BP has forfeited its rights to collect it commissions by its conduct in attempting to secure this Colborne Project for itself.

Neither party ever produced the date of the PF actual contract so the issue of whether this was within the 6 month termination period for commissions still to be earned was not proven. However, this contract provision also would be unenforceable based on BP's conduct.

Boulder Partnership's Motion to Dismiss is DENIED.

Colborne Corporation's Motion to Dismiss is DENIED

17

## AWARD

**As to the Colborne Claims:**

Mikawaya                                                                          Denied

Kroeger                                                                            Denied

Northeast Foods                                                              Denied

Weston                                          $5202.00 awarded as commission overpayment

                                                $10,000.00 awarded as engineering fee unearned

                                                $40,000.00 awarded as BP's responsibility for the additional
                                                expense in the repair of the Weston BBL system

Pepperidge Farms          $200,000.00 awarded for reduction in project price as to all systems

**As to the Boulder
Partnership Claims:**

Trade Secrets Act Claim                                                  Denied

Commission on PF                                                          Denied

Additional $50,000.00 due                                              Denied
on Weston Engineering
used in another project

**Attorney Fees and Costs**          Denied as to both parties. Illinois rule applies and there is no
                                                recovery under any statute that would alter the Illinois rule.


DATED: December 20, 2007          _Richard E. Neville_
                                                Hon. Richard E. Neville (Ret.)
                                                Arbitrator

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: Colborne Corporation / Boulder Partnership, LLC
Reference No. 1340005020

I, Brooke Stauffer, not a party to the within action, hereby declare that on December 20,

2007, I served the attached Final Award on the parties in the within action by facsimile and depositing

true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States

Mail, at Chicago, Illinois addressed as follows:

Stuart D. Gordon Esq.
Gordon & Karr LLP
150 N. Wacker Dr.
Ste. 1650
Chicago, IL 60606  USA
Tel: 312-377-4450
Email: sgordon@gordonkarr.com

Panos T. Topalis Esq.
Tribler Orpett & Meyer PC
225 West Washington Street
Suite 1300
Chicago, IL 60606  USA
Tel: 312-201-6400
Email: pttopalis@tribler.com

John C. Eggert Esq.
Gordon & Karr LLP
150 N. Wacker Dr.
Ste. 1650
Chicago, IL 60606  USA
Tel: 312-377-4450
Email: jeggert@gordonkarr.com

Glenn A. Fischer Esq.
Tribler Orpett & Meyer PC
225 West Washington Street
Suite 1300
Chicago, IL 60606  USA
Tel: 312-201-6400
Email: gwfischer@tribler.com

I declare under penalty of perjury the foregoing to be true and correct. Executed at Chicago,
Illinois, on December 20, 2007.

Brooke Stauffer